UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| ) | |
| Plaintiff, ) | |
| ) | No. 02 CR 112 |
| v. ) | |
| ) | Chief Judge Rubén Castillo |
| MICHAEL SEGAL, ) | |
| ) | |
| Defendant. ) | |

## MEMORANDUM OPINION AND ORDER

Defendant Michael Segal moves for the turnover of corporate stock he believes is his under the terms of a settlement agreement reached by the parties. (R. 2172, Segal's Br.) The government, in turn, seeks reformation of the parties' agreement arguing that, due to a drafting error, the agreement failed to properly memorialize the intent of the parties. (R. 2173, Gov't's Br.) For the reasons stated below, Segal's request for turnover is granted, and the government's request for reformation of the agreement is denied.

## BACKGROUND

The facts underlying this long-running criminal case were fully set forth in several opinions of the U.S. Court of Appeals for the Seventh Circuit. *See United States v. Segal*, 811 F.3d 257 (7th Cir. 2016); *United States v. Segal*, 644 F.3d 364 (7th Cir. 2011); *United States v. Segal*, 495 F.3d 826 (7th Cir. 2007); *United States v. Segal*, 432 F.3d 767 (7th Cir. 2005). They are repeated here only as they pertain to the present dispute. In brief, Segal and his company, Near North Insurance Brokerage ("NNIB"), were charged in 2004 "with a bevy of counts including racketeering, mail and wire fraud, embezzlement, false statements, and conspiracy to impede the Internal Revenue Service." *Segal*, 644 F.3d at 365. Both Segal and NNIB were

convicted following a jury trial. *Id.* NNIB and its parent company, Near North National Group, Inc. ("NNNG"), were forfeited to the government, as were "all assets of these companies, including all of their interests in other companies." *Segal*, 432 F.3d at 776 (emphasis omitted). Segal was ordered to serve a 121-month prison sentence and to personally forfeit $30 million to the government. *Segal*, 495 F.3d at 830. He appealed. *Id.* The Seventh Circuit affirmed his conviction but remanded for further proceedings on the forfeiture issue. *Id.* at 830-40. Specifically, the Seventh Circuit had concerns about potential double-counting if the Court did not account for personal funds that Segal had "poured back into the enterprise[.]" *Id.* at 839. In considering that issue on remand, this Court reduced Segal's personal forfeiture obligation to $15 million. *Segal*, 644 F.3d at 365. Both sides appealed, but the Seventh Circuit affirmed the revised forfeiture judgment. *Id.* at 368.

Thereafter, in order to satisfy the forfeiture judgment, the parties prepared for a hearing scheduled in February 2013 to determine the ownership and value of approximately $47 million in assets being restrained by the government—including financial accounts, insurance policies, stock investments, and partnership interests in real estate ventures, Chicago sports teams, and other entities—that once belonged to Segal and NNIB. *Segal*, 811 F.3d at 259-62. Shortly before the scheduled hearing, the parties negotiated a stipulated settlement agreement directing the distribution of the restrained assets. (Gov't' Ex. Settlement Order 2/13/13.) Segal—by this time out of prison—"participated actively, indeed aggressively, in the negotiation of the settlement." *Segal*, 811 F.3d at 259. In essence, the agreement provided that all restrained assets were listed on a document attached as "Exhibit A" and those that were to be returned to Segal were also listed on "Exhibit B." *Id.* at 264. Assets on Exhibit A that were not specifically listed on Exhibit B would be retained by the government. *Id.* On February 13, 2013, this Court entered an order

2

approving the agreement.[1] (R. 1706, Order.) Upon approval of the settlement agreement, Segal's $15 million personal debt to the government was extinguished, and he obtained the immediate return of approximately $8 million in assets. (*Id.*)

That was far from the end of the matter, however, because various disagreements arose about the terms of the settlement, precipitating several more orders by this Court and another round of appeals by both Segal and the government. *See Segal*, 811 F.3d at 259. As is relevant here, the parties dispute who is entitled to certain "stock, worth about $467,000, in the Rush Oak Corporation, a bank holding company" (herein "Rush Oak stock"). *Id.* at 263. Exhibits A and B to the settlement agreement refer to an asset called "Oak Bank and Trust," which the parties agree was to be retained by Segal. (Gov't Ex. Settlement Order 2/13/13, Exs. A, B.) In Segal's view, the reference to "Oak Bank and Trust" in Exhibits A and B also encompassed his interest in the holding company, such that he is entitled to the Rush Oak stock under the terms of the parties' agreement. (R. 2019, Segal's Mot.) The government disagreed, arguing that the Rush Oak stock was always considered a separate asset by the parties, and that they mutually agreed this asset was to be retained by the government. (R. 2041, Gov't's Mot.) The government acknowledged, however, that the Rush Oak stock was not actually listed on Exhibit A (representing the assets to be retained by the government), which the government attributed to an oversight at the time the agreement was drafted. (*Id.*)

This Court initially sided with Segal and ordered the turnover of this asset. *Segal*, 811 F.3d at 264. The government appealed, however, and the Seventh Circuit held that further proceedings were required to consider whether the omission of the Rush Oak stock from Exhibit A was a "mutual mistake of fact"—in other words, that "both parties assumed the stock would be

---

[1] The Court also retained jurisdiction to implement and enforce the terms of the settlement. (R. 1706, Order at 14.)

3

retained by the government but in the rush of drafting and redrafting of the settlement agreement had failed to mention it." *Id.* If that was the case, the Court would be permitted to reform the parties' agreement to reflect their true intent. *Id.* Accordingly, the Seventh Circuit reversed and remanded for an evidentiary hearing on this issue. *Id.* at 264-65.

On January 23 and 24, 2018, the Court conducted that evidentiary hearing. (R. 2162, Min. Entry; R. 2163, Min. Entry.) The parties submitted numerous exhibits and presented testimony from Thomas Moriarty, a former special investigator with the U.S. Attorney's Office who drafted the exhibits to the settlement agreement; Marc Martin, one of Segal's former attorneys who was involved in negotiating the settlement; and Marsha McClellan, former chief of the Anti-Money Laundering and Organized Crime Sections of the U.S. Attorney's Office who oversaw the forfeiture of Segal's assets. (R. 2164, Hr'g Tr. at 1-203; R. 2165, Hr'g Tr. at 204-74.)

The evidence adduced at the hearing showed that, following the entry of the original forfeiture judgment in 2003, Moriarty began working with criminal case agents to locate Segal's assets. (R. 2164, Hr'g Tr. at 10-12.) This process continued during the appeal, remand, and entry of the revised forfeiture judgment. (*Id.* at 10-19.) When the process began, Moriarty obtained a preliminary list of assets from a revenue agent who had information concerning both Segal's and NNIB's assets. (*Id.* at 12.) The government also issued subpoenas to the managers, shareholders and/or corporate officers of entities that owned some or all of Segal's restrained assets to obtain ownership and financial information. (*Id.* at 12, 116; R. 2165, Hr'g Tr. at 214-15.) McClellan oversaw this subpoena process. (R. 2165, Hr'g Tr. at 215.) As a result of the subpoenas that were issued, information came in about Segal's assets from various entities. (*Id.* at 215-18.) Moriarty oversaw the process of gathering that information and he organized and listed that information in

4

Excel spreadsheets. (R. 2164, Hr'g Tr. at 13-14, 116.) He prepared and updated these spreadsheets, which he referred to as "schedules," on a regular basis. (*Id.* at 18.)

Among the assets that Moriarty received information about were Segal's interests in Rush Oak Corporation and Oak Bank Corporation, both of which were subject to the freeze orders entered by this Court shortly after the 2004 jury verdict. (*Id.* at 26, 27.) Moriarty first spoke with Robert Sullivan ("Sullivan"), the president of both corporations, about these assets in 2005. (*Id.* at 25-26.) Their conversation dealt with the subpoenas that had been served by the government. (*Id.* at 25.) Moriarty had additional conversations with Sullivan in 2006 and 2007, and also had written communications with Sullivan when he was trying to determine the value of Rush Oak Corporation stock and Oak Bank Corporation stock to put on his asset schedules. (*Id.* at 26, 28-29, 31; Gov't's Ex. Moriarty 3.) During these communications, Sullivan told Moriarty that Oak Bank Corporation and Rush Oak Corporation are two separate companies. (Gov't's Ex. Moriarty 3; R. 2164, Hr'g Tr. at 118; R. 2165, Hr'g Tr. at 219.) As of June 14, 2006, Moriarty knew that Rush Oak Corporation and Oak Bank Corporation were two separate entities. (R. 2164, Hr'g Tr. at 29, 118.) Moriarty understood from these communications that Rush Oak Corporation was a holding company that owned the stock of Oak Bank Corporation. (*Id.* at 118, 144.)

In his schedule of assets, Moriarty had a "generic" category he referred to as "partnerships." (*Id.* at 17.) Moriarty included limited liability companies, corporations, and other entities in this category even though they were not actually partnerships. (*Id.*) For example, he listed "Rush Oak Bank and Trust" as a partnership, even though he knew from Sullivan's letter that Rush Oak Corporation and Oak Bank Corporation were actually separate corporations, and that neither was a partnership. (*See id.*; Gov't's Exs. Moriarty 1, 4, 6.) Moriarty never actually listed either "Rush Oak Corporation" or "Oak Bank Corporation" as an asset in his schedules. (R. 2164, Hr'g Tr. at 119, 128-29.) Instead, he used a variety of terms to refer to these

5

corporations in the many schedules he prepared. Originally, he referred to these corporations simply as "Oak Bank." (R. 2165, Hr'g Tr. at 257.) He later characterized the assets simply as "Rush Oak Bank and Trust," even though he understood that there was "no asset that's truly named Rush Oak Bank and Trust." (R. 2164, Hr'g Tr. at 120; Gov't's Exs. Moriarty 1, 4, 6.) Moriarty thought that "Rush Oak Bank and Trust" was "some sort of bigger bank than Oak Bank." (R. 2164, Hr'g Tr. at 118.) In his mind, Rush Oak Corporation was a "bank holding company or something like that." (*Id.* at 19.) He believed that Rush Oak Corporation "was associated with Oak Bank, and Oak Bank was associated with Rush Oak." (*Id.* at 118.)

In the asset schedule he prepared in September 2012, Moriarty listed "Rush Oak Bank and Trust" as a "partnership" worth $467,000. (*Id.* at 44; Gov't's Ex. Moriarty 1.) In January 2013, Moriarty updated his schedule again in anticipation of the upcoming evidentiary hearing, which was to be held in early February 2013. (R. 2164, Hr'g Tr. at 58-59; Gov't Ex. Moriarty 6 at GSA076.) Moriarty testified that his January 2013 asset schedule was intended to represent the "universe" of Segal and NNIB assets that had been restrained by this Court. (R. 2164, Hr'g Tr. at 16, 108.) In the January 2013 schedule, he again referred to an asset called "Rush Oak Bank and Trust" and listed it as a partnership owned by Segal. (Gov't Ex. Moriarty 6.) Moriarty's January 2013 schedule also identified the cash dividends paid on the Oak Bank Corporation stock ($3,240), although the schedule did not list the Oak Bank Corporation stock itself as an asset or provide a value for this stock. (*See* Gov't Ex. Moriarty 6 at GSA 073; R. 2164, Hr'g Tr. at 119, 128-129.) Moriarty acknowledged that he "made a mistake" by failing to list Oak Bank Corporation and Rush Oak Corporation separately in his 2007, 2009, and 2013 schedules, and by failing to list Oak Bank Corporation as an asset on the January 2013 schedule. (R. 2164, Hr'g Tr. at 32.)

6

During the month of January 2013, the parties engaged in extensive settlement negotiations. (R. 2164, Hr'g Tr. at 68-71, 129.) During their negotiations, the parties used Moriarty's January 2013 schedule and a January 2013 Consolidated Schedule of Assets, referred to as "CATS," which was an internal record "kept by the asset forfeiture paralegals [in the U.S. Attorney's Office] in conjunction with the U.S. Marshals Service." (*Id.* at 22; *see also id.* at 129, 184; R. 2165, Hr'g Tr. at 235; Gov't Ex. Moriarty 2.). Accordingly to Moriarty, the CATS schedule was updated "whenever the Marshals Service received some sort of distribution, sale of asset or a check." (R. 2164, Hr'g Tr. at 23.) The CATS schedule lists the dividends totaling $3,240 received from "Oak Bank," but this schedule does not list the stock itself as an asset, nor does it list Rush Oak Corporation or its stock as assets. (Gov't Ex. Moriarty 2.)

After various settlement discussions, the government offered to settle with Segal by giving him $8 million in assets as well as forgiving his $15 million forfeiture obligation, in exchange for the forfeiture of all other restrained assets. (R. 2164, Hr'g Tr. at 68-71.) The government told Segal and his attorneys that Segal could take any assets listed in Moriarty's January 2013 asset schedule up to a total value of $8 million, or he could elect to take $8 million in cash. (R. 2164, Hr'g Tr. at 125, 148.)

On February 1, 2013, the parties engaged in additional settlement negotiations at the U.S. Attorney's Office. (*Id.* at 157-63.) Segal, Martin, and his two other attorneys—Jennifer Doherty and Ed Joyce—were in one room, while Moriarty and the government attorneys—McClellan and Bill Hogan—were in another.[2] (*Id.*) At some point, Martin left the room where Segal and his

---

[2] Doherty, Joyce, and Hogan all served as counsel of record at the evidentiary hearing and so they did not testify. (*See* R. 2164, Hr'g Tr. at 1.) Prior to the hearing, the Court advised the attorneys that they would not be permitted to both testify as witnesses at the hearing and serve as counsel. (*See* R. 2149, Status Hr'g Tr. at 10-11.) The government thereafter elected to have Hogan serve as counsel, and Segal likewise elected to have both Joyce and Doherty serve as his counsel at the hearing. Segal himself opted not to testify after determining that his testimony would be "cumulative." (R. 2165, Hr'g Tr. at 207.)

7

attorneys were meeting to continue negotiating with the government. (*Id.* at 158.) The first time Martin left the room, the government told him that its final settlement offer was $8 million. (R. 2164, Hr'g Tr. at 160-61.) The parties then debated who was going to take an asset called Lakeshore Entertainment Corp. (*Id.* at 78-79, 160.) As Martin recalled it, "neither side was particularly interested in retaining that asset." (*Id.* at 160.) After speaking with Segal separately again, Martin returned to speak with the government attorneys and Moriarty, this time stating that Segal wanted "more cash" if he was going to take Lakeshore Entertainment Corp. (*Id.*) Hogan, McClellan, and Moriarty then went upstairs to speak with their superiors, after which they told Martin that the government was willing to raise its offer to settle to approximately $8.45 million. (*Id.* at 78, 82, 160-63.)

The $8.45 million offer was comprised of some assets that Segal had selected, including an interest in the Chicago Bulls, certain insurance policies, cash, and a restaurant called Gibson's, as well as Lakeshore Entertainment Corp. (*Id.* at 80, 86, 141; R. 2165, Hr'g Tr. at 240.) Martin listed the assets that were being discussed on a piece of paper, which included the government's valuations of these assets as reflected on Moriarty's January 2013 asset schedule, other than the value of Lakeshore Entertainment Corp., which had been reduced from $2.3 million to $1.6 million as a result of the parties' negotiations. (R. 2164, Hr'g Tr. at 161-62; Gov't Ex. Martin 1.) As to the valuations Martin wrote next to each asset listed, Martin rounded the valuations up or down. (R. 2164, Hr'g Tr. at 162.) For example, Gibson's (which he referred to as "Rush"—apparently shorthand for the business venture "1028 North Rush") was valued on Moriarty's schedules at $195,000, but Martin listed it with a value of $200,000. (*Id.*) Similarly, the two insurance policies that Segal was taking were valued on Moriarty's schedules at approximately $2,040,000, but Martin rounded that down to $2,000,000 on his list. (*Id.*) Martin's

8

list also included certain details of what was agreed to as part of the settlement. (Gov't Ex. Martin 1.) For example, next to the entry for the Chicago Bulls interest, he wrote, "[O]ption Bulls 1st refusal." (*Id.*; R. 2164, Hr'g Tr. at 165.) This was intended to reflect the government's agreement to give Segal a right of first refusal and an option to purchase the other half of his Bulls interest. (R. 2164, Hr'g Tr. at 165.) Martin wrote this down on his list because "[t]here was one Bulls asset, and there was discussion whether Mr. Segal was going to receive the entirety of the Bulls or half of that asset." (*Id.* at 175.) Similarly, next to "insurance" Martin wrote "option insurance." (Gov't Ex. Martin 1; R. 2164, Hr'g Tr. at 165, 176.) This was intended to reflect the government's agreement to give Segal an option to purchase the remaining insurance policies within six months. (R. 2164, Hr'g Tr. at 165, 176.) As Martin recalled it, "the insurance was worth somewhere in the neighborhood of $4 million," and he wanted to reflect that Segal was not receiving this entire asset but was instead "going to be given an option to purchase half of the insurance, 2 million, within a date certain." (*Id.* at 176.) Hogan prepared a similar list during the parties' negotiations, and he described the assets being awarded to Segal as "2.5 cash, 2.15 Bulls, 1.6 Lakeshore, 2.0 Insurance, [and] .2 Gibson." (Gov't Ex. Hogan 3.)

Following his discussion with Hogan, McClellan, and Moriarty, Martin returned to the conference room to meet with Segal and Segal's other lawyers. (R. 2164, Hr'g Tr. at 163, 183.) A while later, Martin returned to speak with Hogan, McClellan, and Moriarty again. (*Id.* at 163; R. 2165, Hr'g Tr. at 241.) He told them that in addition to the assets listed on the paper, Segal wanted "Oak Bank." (R. 2164, Hr'g Tr. at 171.) The parties are in disagreement over whether a discussion then ensued about the distinction between Rush Oak Corporation and Oak Bank Corporation. Moriarty testified that, in response to Martin's demand for "Oak Bank," he told the entire group in the room that "there's an issue," and then went on to explain the distinction

9

between the two corporations and the differing values associated with the stock of each one. (*Id.* at 87-89.) Martin flatly denies that any such conversation occurred in his presence. (*Id.* at 185.) McClellan recalled that there was a conversation about the distinction between these assets, but her recollection was that the conversation occurred between herself, Moriarty, and Hogan. (R. 2165, Hr'g Tr. at 243.)

Ultimately, the government agreed that Segal could have "Oak Bank," so Martin added this asset to the top of his list. (*Id.* at 164-66.) Similarly, Hogan listed "Oak Bank stock" at the top of his list, although neither Martin's nor Hogan's list included a valuation for this asset. (*Id.* at 166; Gov't Ex. Martin 1; Gov't Ex. Hogan 3.) Martin testified that there was no valuation on his list next to Oak Bank because that was never discussed.[3] (R. 2164, Hr'g Tr. at 169.) The only discussion Martin recalled about Oak Bank was a dividend amount, but Segal was not interested in obtaining the dividends and instead wanted the stock itself. (*Id.* at 169, 186.) Martin testified that if the government had said anything about there being two separate "Oak Bank" assets—one being a holding company stock worth $467,000 and the other being a bank stock worth about $20,000—he would have written that on his list. (*Id.* at 176-77.) Specifically, he would have "written down that the Oak Bank asset was being divided," as well as the values of the divided assets. (*Id.* at 177.) Moriarty testified that there was no value included on either list because the Oak Bank stock had never been included as an asset on any schedule, and he did not have the underlying valuation paperwork with him during the parties' last-minute settlement negotiations. (*Id.* at 91, 123-24.) The parties agree that after some discussion about "Oak Bank," Martin took his list back to Segal, and returned a few minutes later to say that Segal had accepted the offer.

---

[3] Martin testified that he had no independent recollection of any discussion about the value of the Oak Bank stock, but acknowledged that it was "possible" Moriarty had said the stock was worth $20,000. (R. 2164, Hr'g Tr. at 186.) He testified definitively that no one told him about the distinction between these corporate assets or explained that they had significantly different values. (*Id.* at 185.)

10

(*Id.* at 90, 166.) Martin had Segal sign the list of assets as reflecting his understanding of the settlement agreement, and Martin showed the signed paper to the government. (*Id.* at 166-68, 244; Gov't Ex. Martin 1.)

Martin acknowledged that at no time during the settlement negotiations did he use the term "Rush Oak." (R. 2164, Hr'g Tr. at 169-70.) But this was because Martin was unaware that there were two separate names for the stock during the settlement negotiations, so he did not distinguish between Rush Oak Corporation and Oak Bank Corporation. (*Id.* at 170.) He thought that the asset consisted of one corporation called "Oak Bank" with two different classes of stock. (*Id.*)

On February 2, 2013, which was a Saturday, Moriarty went into the U.S. Attorney's Office to prepare the documents to effectuate the settlement, including Exhibits A and B. (*Id.* at 94.) Exhibit A was intended to reflect all assets that appeared on Moriarty's January 2013 asset schedule, and Exhibit B was to include all assets among those listed on Exhibit A that were to be released to Segal. (*Id.* at 94-95.) However, Moriarty had a number of computer problems when transferring information from his January 2013 asset schedule into the exhibits to the settlement agreement. (*Id.* at 96.) Moriarty's first draft of Exhibit A included an asset he referred to as "Rush Oak Bank and Trust," which he mistakenly listed as having a value of $367,000, but Exhibit A did not list either "Rush Oak Corporation" or "Oak Bank Corporation" stock. (*Id.* at 96, 108; Gov't Ex. Moriarty 7 at GSA079.)

On February 4, 2013, the parties continued to negotiate the terms of their agreement, and Segal agreed to receive less cash in exchange for two additional assets that are unrelated to the present dispute. (R. 2164, Hr'g Tr. at 109-10.) Moriarty then created new Exhibits A and B to reflect these changes. (*Id.* at 110; Gov't Ex. Moriarty 8.) This time, both Exhibit A and Exhibit B

11

listed an asset called "Oak Bank and Trust" with an "unknown" value as being released to Segal. (R. 2164, Hr'g Tr. at 110; Gov't Ex. Settlement Order 2/13/13.) In the body of the settlement agreement, however, the asset being released to Segal is described as "Oak Bank Trust and Savings." (Gov't Ex. Settlement 2/13/13 ¶ 3(b).) McClellan did not know where this name—which is not the name for either Rush Oak Corporation or Oak Bank Corporation—had come from. (R. 2165, Hr'g Tr. at 263.)

Following the evidentiary hearing, the parties submitted briefs arguing their respective positions. (R. 2172, Segal's Br.; R. 2173, Gov't's Br.) In Segal's view, the evidence at the hearing demonstrated that there was no mutual mistake regarding the Rush Oak stock, and that instead the government made a unilateral mistake in failing to delineate that it was retaining any interest in this asset. (R. 2172, Segal's Br. at 17-24; R. 2174-1, Segal's Reply at 1-7.) The government, by contrast, believes that the evidence demonstrated that both sides clearly understood that there was a distinction between "Oak Bank" and the Rush Oak stock, and that a mutual mistake was made in drafting the agreement. (R. 2173, Gov't's Br. at 15-16.)

## ANALYSIS

"A settlement agreement is a contract, and contracts are interpreted according to the law of the jurisdiction in which the contract was created." *In re Motorola Sec. Litig.*, 644 F.3d 511, 517 (7th Cir. 2011). The Court therefore looks to Illinois contract law to interpret the parties' settlement agreement.[4] Illinois law provides that "[w]here a written agreement is clear and explicit, a court must enforce the agreement as written." *Cannon v. Burge*, 752 F.3d 1079, 1088 (7th Cir. 2014) (citation omitted). "Both the meaning of the instrument, and the intention of the parties must be gathered from the face of the document without the assistance of parol evidence or any other extrinsic aids." *Id.* (citation omitted). Thus, in most cases, the Court must enforce

---

[4] The parties agree that Illinois law governs their dispute. (R. 2165, Hr'g Tr. at 274.)

the agreement as drafted, and "[t]here is a strong presumption against provisions that easily could have been included in the contract but were not." *Klemp v. Hergott Grp., Inc.*, 641 N.E.2d 957, 962 (Ill. App. Ct. 1994).

Nevertheless, "[a] court may reform a contract when the written agreement does not reflect the parties' intent," in other words, where "the parties reached an agreement but then erred somehow (by mutual mistake of fact, or by mistake on one side and fraud on the other) in reducing that agreement to writing, with the result that the writing fails to reflect the parties' agreement." *CitiMortgage, Inc. v. Parille*, 49 N.E.3d 869, 879 (Ill. App. Ct. 2016). Reformation is permitted only if there is a "mutual mistake" by the parties, meaning that "the contract has been written in terms which violate the understanding of both parties." *Id.* (citation omitted). "In such a case, the parties are in actual agreement, but the instrument to be reformed, in its present form, does not express the parties' real intent." *Id.* (citation omitted).

On the other hand, a unilateral mistake by one party is not a basis for reformation. *Lyons Lumber & Bldg. Ctr., Inc. v. 7722 N. Ashland*, 59 N.E.3d 830, 837 (Ill. App. Ct. 2016). In such a case, there is no "meeting of the minds," which is a necessary component of an enforceable contract. *Klemp*, 641 N.E.2d at 965. Because "[t]here is a presumption that a written instrument conforms to the intention of the parties thereto," *id.* at 964, "[t]he party wishing to reform a contract must show mutual mistake by clear and convincing evidence[.]" *Fisher v. State Bank of Annawan*, 643 N.E.2d 811, 814 (Ill. 1994); *see also Bd. of Trs. of Univ. of Ill. v. Ins. Corp. of Ireland*, 969 F.2d 329, 332 (7th Cir. 1992) ("The relevant standard in contract reformation cases is clear and convincing evidence." (citation omitted)); *Typenex Co-Inv., LLC v. Solar Wind Energy Tower, Inc.*, 123 F. Supp. 3d 1017, 1028 (N.D. Ill. 2015) (observing that under Illinois law, reformation requires a showing of mutual mistake "by clear and convincing evidence").

13

Although there is certainly evidence supporting both sides of this dispute, the Court concludes that the government has failed to provide clear and convincing evidence of a mutually held misunderstanding between the parties that would permit the Court to reform their agreement as the government requests. Instead, the record reveals significant confusion on both sides over the matter of the Rush Oak stock.

The record reflects that, as of 2006, the government knew that there were two separate corporations called Oak Bank Corporation and Rush Oak Corporation. (R. 2164, Hr'g Tr. at 13-31, 118, 144; Gov't Ex. Moriarty 3.) Nevertheless, the government never actually listed either Rush Oak Corporation or Oak Bank Corporation as an asset on any of its schedules. (R. 2164, Hr'g Tr. at 119, 128-29.) Not only did Moriarty fail to list the stock of either Rush Oak Corporation or Oak Bank Corporation as an asset on any of his schedules, but he also misnamed these assets, initially referring to them simply as "Oak Bank," and later as "Rush Oak Bank and Trust," even though he knew there was "no asset that's truly named Rush Oak Bank and Trust." (R. 2165, Hr'g Tr. at 257; R. 2164, Hr'g Tr. at 120; Gov't's Exs. Moriarty 1, 4, 6.) He also admittedly mischaracterized these assets as a "partnership," even though he knew they were actually two separate corporations. (R. 2164, Hr'g Tr. at 118, 144; Gov't's Exs. Moriarty 1, 4, 6.) Moriarty made additional mistakes in drafting the settlement documents, referring to the asset being released to Segal alternatively as "Oak Bank and Trust" and "Oak Bank Trust and Savings," which is not the actual name of any asset. (Gov't Ex. Settlement 2/13/13; Gov't Ex. Moriarty 8; R. 2164, Hr'g Tr. at 109-10; R. 2165, Hr'g Tr. at 263.)

The testimony about what occurred during the parties' final negotiations at the U.S. Attorney's Office on February 1, 2013, was also less than definitive. Moriarty testified that he told Martin that "Oak Bank" involved two separate assets, but Martin credibly testified that no

14

such discussion ever took place in his presence. (R. 2164, Hr'g Tr. at 87-89, 185.) McClellan recalled that there was a conversation about there being two distinct "Oak Bank" assets, but her testimony was that this conversation occurred between herself, Moriarty, and Hogan. (R. 2165, Hr'g Tr. at 243.) Martin's contemporaneous notes of the settlement negotiations reflect that, where an asset was being divided or there was some other complicating factor, he wrote that down. (Gov't Ex. Martin 1.) Martin credibly testified that, had anyone told him about the distinction between Oak Bank and Rush Oak stock, he would have written that down too. (R. 2164, Hr'g Tr. at 176-77.) Yet there is nothing listed on Martin's sheet other than the words "Oak Bank." (Gov't Ex. Martin 1.) On this record, the Court cannot conclude that Martin clearly understood the distinction between Rush Oak and Oak Bank, or that he understood the government was retaining part of this asset under the terms of the settlement agreement.

The Court does not mean to suggest that Moriarty was not credible when he testified that Martin was present during the conversation on this issue, but these events happened more than five years ago, and there were many meetings that occurred as part of the settlement process, often involving different individuals and different locations, and sometimes with people entering and leaving the room during a meeting. (See, e.g., R. 2164, Hr'g Tr. at 63, 65, 71-77.) There were points in Moriarty's testimony where he appeared to confuse the various meetings or to be unsure who was in the room at the time. (See R. 2164, Hr'g Tr. at 71-72, 77, 87.) The Court does not believe that Moriarty was being untruthful in his testimony, but finds it likely that, five years after the fact, he was simply confused about whether Martin was actually part of the conversation regarding the Rush Oak and Oak Bank stocks during the parties' last-minute negotiations.

There is also an insufficient basis in the record to conclude that Segal intentionally concealed facts or otherwise engaged in fraud in order to obtain the Rush Oak stock. By all

accounts, Segal was not in the room during the conversation in which Moriarty claims to have told Martin and the others about the distinction in the assets. Instead, he was in another room down the hall. (R. 2164, Hr'g Tr. at 157-60; R. 2165, Hr'g Tr. at 234.) Segal was no doubt aware that Rush Oak and Oak Bank were separate corporations, as he had purchased the stock of each corporation decades earlier. Indeed, he admitted as much in an affidavit—a document repeatedly referenced by the government at the evidentiary hearing—submitted to the Court in support of any earlier filing Segal made in these proceedings. (*See* R. 2164, Hr'g Tr. at 170-71, 200; R. 2165, Hr'g Tr. at 270; *see also* R. 2019, Segal Aff. ¶ 3.) But in that same affidavit, Segal attested that both Oak Bank Corporation and Rush Oak Corporation operated under the name "Oak Bank." (R. 2019, Segal Aff. ¶ 3.) Segal could have reasonably understood that his mention of "Oak Bank" (through Martin) referred to all interests associated with the asset listed on the government's schedules. It was the government who repeatedly listed these corporate assets as one entity—and a misnamed entity at that. (*See* Gov't's Exs. Moriarty 1, 4, 6; *see also* R. 2164, Hr'g Tr. at 129.) Although it may have been the clear understanding of the *government* that Segal was not getting all the interests associated with the two corporations, it is not at all clear from the record that Segal and his defense team shared this understanding. *See CitiMortgage*, 49 N.E.3d at 879 (observing that a mutual mistake is "one common to the parties such that each labors under the same misconception" (citation omitted)).

It is true, as the government points out, that Martin acknowledged that he never mentioned "Rush Oak" during the parties' negotiations, but that was because he did not know there was any distinction between Rush Oak and Oak Bank at that time. (R. 2164, Hr'g Tr. at 170.) He thought the asset the parties were referring to involved one corporation with two different classes of stock. (*Id.*) Clearly there was significant confusion on all sides, as there is no

actual entity called "Oak Bank and Trust," which is how the asset is referred to in the exhibits to the settlement agreement drafted by the government. (*Id.* at 110; Gov't Ex. Settlement 2/13/13.) Indeed, there is a lack of consistency even within the settlement agreement itself, as the exhibits refer to an asset called "Oak Bank and Trust," whereas the body of the settlement agreement refers to an asset called "Oak Bank Trust and Savings." (*See* Gov't Ex. Settlement 2/13/13 ¶ 3(b).) Neither is the proper name of any asset belonging to Segal or NNIB.

The government suggests that it could not possibly have offered the Rush Oak stock to Segal because this would have put the total value of the assets he was receiving well over $8.4 million, which was the final number the government had been authorized to offer him by the supervisory chain in the U.S. Attorney's Office. (R. 2173, Gov't's Br. at 8-9.) Again, the *government* may have had a clear understanding of what Segal was being offered, but it is not clear that Segal and his defense team had the same understanding. Although Martin testified that he understood the government's offer was not $9 million (which it would be if one counted the Rush Oak stock), it is not clear from his testimony that he understood the Rush Oak stock had a value of $467,000 at the time of the parties' last-minute negotiations. (R. 2164, Hr'g Tr. at 185-86.) It is true that Moriarty's January 2013 schedule listed "Rush Oak Bank and Trust" as an asset worth $467,000, (Gov't Ex. Moriarty 7 at GSA 076), but Martin testified that he "wasn't really dealing with those schedules" during the final stages of the negotiations. (R. 2164, Hr'g Tr. at 184-85.) This testimony is not inherently unbelievable, as the schedules were lengthy and the parties were negotiating over a variety of different assets worth millions of dollars. (*See* Gov't Ex. Moriarty 2, 7.) Indeed, Moriarty acknowledged that he did not have all the asset valuation information at his disposal during the last-minute negotiations either. (R. 2164, Hr'g Tr. at 91, 123-24.)

17

Although Segal likely knew the value of the Rush Oak stock, by all accounts he was not in the room with McClellan, Hogan, Moriarty, and Martin during their last-minute discussion of this issue. (R. 2164, Hr'g Tr. at 163, 183; R. 2165, Hr'g Tr. at 241.) As far as the record reveals, Segal was told by Martin that the government's final offer was $8.4 million, he countered (from the other room) with the addition of "Oak Bank," and was then told by Martin that the government had accepted his counteroffer. (R. 2164, Hr'g Tr. at 90, 166, 171.) He may have simply believed that the government had increased its offer, or that they had mutually agreed he would accept any uncertainty over the value of the stocks. At least the government has not clearly and convincingly proven otherwise. The contemporaneous documentation created by Hogan and Martin does nothing to dispel the uncertainty, as neither list includes a value for the "Oak Bank" asset Segal was getting as part of the parties' agreement.[5] (R. 2164, Hr'g Tr. at 91, 123-24; Gov't Ex. Moriarty 1; Gov't Ex. Hogan 3.) The Court has fully considered the possibility that Segal may have been trying to capitalize on the confusion over these assets, but the record does not permit a finding that he engaged in fraud.

In short, there is far too much ambiguity in the record for the Court to find "clear and convincing evidence" of a mutual mistake regarding the Rush Oak stock. *See Fisher*, 643 N.E.2d at 814. Due to the government's repeated mislabeling of the Rush Oak/Oak Bank assets in the schedules and settlement documentation, and the differing testimony from the government's witnesses about exactly what occurred during the final stages of the parties' negotiations, the Court cannot find that the parties mutually understood that Segal was not getting the Rush Oak stock as part of their agreement. Therefore, Segal is entitled to the turnover of this asset.

---

[5] To add to the confusion, the contemporaneous documentation created by Hogan listed total assets of $8.345 million being awarded to Segal, rather than $8.4 million. (Gov't Ex. Hogan 3.) At the hearing, Hogan (during questioning of various witnesses) attributed this to a mathematical error on his part. (R. 2164, Hr'g Tr. at 83-84; R. 2165, Hr'g Tr. at 239.)

## CONCLUSION

For these reasons, the government's request for reformation of the parties' settlement agreement (R. 2173) is DENIED. Defendant Michael Segal's request for turnover of the Rush Oak Corporation stock (R. 2172) is GRANTED.

ENTERED: _____
Chief Judge Rubén Castillo
United States District Court

Dated: May 17, 2018